### WINEBERG *v.* PORTER.

SALES—FRAUD.

> Where plaintiff purchased a horse which he knew was sick, for slightly more than half its value if it had been in good health, and defendants did nothing to deceive or defraud him, the court did not err to plaintiff's prejudice in refusing to charge, in an action to recover back the purchase price after its death, that, if the horse was incurably sick at the time of purchase, plaintiff could recover: it was not incorrect to limit his right of recovery to the issues of fraud and whether he acted on his own judgment.[1]

Error to Chippewa; Oren, J. Submitted November 13, 1912. (Docket No. 24.) Decided July 9, 1913.

Assumpsit in justice's court by Samuel Wineberg against George Porter and Harry Gemmel to recover back the purchase price paid for a horse. From a judgment for plaintiff, defendants appealed to the circuit court. Judgment for defendants. Plaintiff brings error. Affirmed.

*F. T. McDonald,* for appellant.

*John W. Shine,* for appellees.

MOORE, J. This was an action of assumpsit brought by plaintiff to recover back money paid to defendants by plaintiff for the purchase price of a sick horse. The case was commenced in justice's court, where a judgment was rendered in favor of the defendants. The case was appealed to the circuit court, where it was tried by a jury, which returned a verdict in favor of defendants. The case is brought here by writ of error.

[1] On the question of the liability of a vendor of diseased live stock, in the absence of express warranty, see note in 29 L. R. A. (N. S.) 202.

The questions for our consideration grew out of the refusal of the court to give two requests to charge offered by the plaintiff and to his charge as given. The requests to charge are as follows:

"(1) You are instructed that if you find, by a preponderance of the evidence, that the horse which plaintiff purchased of defendants was, at the time of the sale, suffering from a fatal disease, or combination of diseases, which culminated in the animal's death, the plaintiff would be entitled to recover the purchase price paid defendants for the horse, and for expenses for medicine and care in attempting to cure the animal, and for necessary expenses incurred for burial of the same, and cleaning plaintiff's barn of the diseased matter caused by the horse's illness and death. And if you so find, your verdict should be for the plaintiff.

"(2) You are also instructed that, where the seller of property makes a misrepresentation respecting the property he is selling, and the buyer is actually defrauded in the purchase of the same by the misrepresentation, it does not matter whether the seller was innocent of any intentional fraud or misrepresentation, the buyer would be entitled to recover of the seller the amount paid for the property. And if you should find in this case that the horse in question was represented by the defendants, or either of them, at the time of the sale to have merely a cold in the head, and that, as a matter of fact, it was suffering from a complication of diseases, the plaintiff would be entitled to recover, even though the defendants made the representations innocently and without any intentional fraud."

The parts of the charge to which exceptions are taken are as follows:

"With respect to this claim of the plaintiff I would say to you that I don't think he would be entitled to recover in this case unless he has been able to prove, and prove to your satisfaction, that he was induced to make this purchase by reason of actual fraud, actual false and fraudulent representations made by the defendants to him, whereby he was deceived into making this purchase. *  *  *

"Now I would say to you, gentlemen, that you must find in this case, in order to entitle the plaintiff to recover, that this was a case of actual deception practiced upon him upon the part of the defendants, and it must appear to you that he acted upon these alleged deceptive or false statements. If the plaintiff, in making the purchase, acted upon his own judgment, upon his own idea that he would be able to effect a cure of that horse, and made the purchase knowing, as it is admitted he did know, that the horse was sick, that he did not himself do what he had an opportunity to do, call in a veterinary to determine the actual condition, but relied solely upon his own judgment, his own expectations that he might be able to effect a cure, then it could not be said that he had been deceived by these representations. And, as I have just stated, unless you find that it was a case of actual deception, that this man was actually deceived to his undoing in this case, he could not be held entitled to recover.    *    *    *

"Now, if you find in this case that such were the facts, that this man knew the condition of the horse beforehand, and bought merely for the purpose of speculation, and of intending to take his chances upon his ability to cure and thereby secure to himself a valuable horse, you should find in the defendants' behalf, as I don't think a recovery could properly be predicated upon a state of facts such as I have last detailed.

"Plaintiff's counsel has asked me to charge in effect, that as long as this horse was afflicted with an incurable disease at the time of the purchase, that that fact would render the purchase void, and would entitle the plaintiff to recovery. I do not believe that such is the law in this case, gentlemen of the jury. I think that if this plaintiff, knowing the condition, and not being deceived in any respect by any acts or representations, or any references upon the part of the defendants, bought, with his eyes open, speculating, taking his chances upon his ability to cure the horse, the purchase was absolute and could not be rescinded."

The record discloses that the plaintiff was a man of mature years and had considerable experience in buying and selling horses. The defendants, for about two

months, had been in the habit of buying horses in Chicago and selling them in northern Michigan. Shortly before the transaction which gave rise to this litigation, they bought 12 horses and put them in the stable of the Fountain House at Sault Ste. Marie, and offered them for sale. Among them was a mare for which they paid $130 in Chicago. The plaintiff says they offered to sell him this horse for $150. This horse was taken sick. The plaintiff testified as follows:

"He [Mr. Gemmel] showed me the same horse he showed me on the 12th, and I says, 'I will buy that horse providing you will sell it cheap enough.' First, on the 12th of March he wanted $150 for the horse, and the next time he came down to $100. It was a chestnut mare.

"*Q.* What was said and done between you?

"*A.* Well, I says, 'I won't give you $100; I will give you $75, because I have no horse to work.' 'Why,' he says, 'I won't take $75, too little,' and finally I hung around there, and he talked and talked until he closed at $82.50 for the horse, and I had $22.50 in my pocket, and I says, 'Come into the bank, and I will give you the balance of the money;' so I went into the bank and drew $60 more and give him. I don't know where Porter was during this time. I never saw him at all. He was around tending to the horses or something. He didn't come near and hear the bargain. The horse was right there in the stall.

"*Q.* What was said, if anything, by Mr. Gemmel, about the horse having a cold?

"*A.* First, when I stopped to see the horse, that was on the 14th day of March, the horse had some cracked corn and some hay in the manger, and I says, 'What is the matter, the horse don't eat?' 'Why,' he says, 'he has a heavy cold in his head, but if he gets into a new barn and gets a few bran mashes he will be all right;' and I bought on the condition that he had a cold in his head, and I bought the horse and took him home.

"*Q.* What did you do with him?

"*A.* Put him in the barn, and put three blankets on

him, first thing, and I went in the house and got some hot water, and took some bran and gave him a hot mash—poured it into the box in the manger, and the mare would not look at it."

Later in the day he took the mare out on the street and she got down on the ice and in the snow and slush. After he got her home he called a veterinary and she got steadily worse, dying March 18th. She was purchased March 14th. Plaintiff claims the mare had something more than a cold when he bought her, and that she was fatally ill, and because of that he should have the purchase money back.

It is the claim of defendants that they paid $130 for this mare in Chicago; that they offered her for sale for $150 at Sault Ste. Marie before she became sick, and that after she took cold she was sold to plaintiff as a sick horse for $82.50, he knowing as much about her condition as they did. On the cross-examination, the plaintiff stated, among other things:

"*Q.* You say now that when you first saw him, on the 12th, he asked you $150?

"*A.* Yes, sir.

"*Q.* Now, you knew $150 was too much, did you?

"*A.* Why, I didn't know nothing about it.

"*Q.* Well, after buying the horse when Mr. Gemmel suggested to you some way you ought to treat the horse, didn't you tell them that you knew more about a horse than they did?

"*A.* I didn't tell them no such thing, that I knew more about a horse than they did.

"*Q.* What did you say?

"*A.* I says, for a bluff, that I knew more about horses than they did. I told you that in justice's court.

"*Q.* But didn't you tell him at the time that he sold you the horse?

"*A.* No, sir.

"*Q.* When did you tell him that the first time?

"*A.* Oh, I don't know. I think Mr. Porter was in my store one day.

"*Q.* You didn't tell him over at the barn when they

were undertaking to tell you how to treat the horse?

"*A.* No, sir; only they told me to take him home and give him a few hot bran mashes; that is the only reason I bought the mare, and it would be all right.

"*Q.* Didn't you say that you had been in a stable that had 150 horses—

"*A.* I said it same as I said that bluff.

"*Q.* When did you say that?

"*A.* On the 12th day of March.

"*Q.* That was while you were at the barn, was it?

"*A.* Yes, sir.

"*Q.* Well, what were they saying to you then, that they gave you a bluff?

"*A.* Didn't say nothing; just talking about horses; Lavines was in there, and just chewing the rag—didn't talk nothing about buying horses, or anything of that kind.

"*Q.* How did you come to tell these defendants that you knew more about horses than they did?

"*A.* I don't remember telling the defendant. · I was talking to quite a few of them, that was in the barn chewing the rag, but didn't tell the defendants any more than the rest.

"*Q.* Do you mean to say that you told the whole crowd that you knew more than they did?

"*A.* Yes, I divided the whole crowd with it.

"*Q.* You say you were only bluffing?

"*A.* Yes, sir.

"*Q.* What did you expect to gain by bluffing?

"*A.* Didn't expect to gain nothing, only I gave him the bluff.

"*Q.* What for?

"*A.* Oh, I don't know, only I just cut in that way."

One witness testified, among other things, as follows:

"*A.* Well, he offered him $75, and Mr. Gemmel wanted $100, and at last he says, 'I will tell you what I will do with you. If you want the mare I will let you have her for $90;' and Mr. Wineberg says, 'I will tell you what I will do. I will give you $80;' and at last Mr. Gemmel says, 'I will take $85, being as it is a cash deal, and we have a lot of horses on hand.' And then I saw there was only $5 difference between them,

and I says, 'Split the difference, you fellows;' and so they did split the $5 between them. Then I says, 'Split the difference and make it $82.50,' and they did. Wineberg said, 'Well, all right, $2.50 don't cut much figure either way.' He didn't say anything at that time, but at the time he made the offer of $80, he said, 'I will give you $80, and I don't give a damn if she dies tomorrow, I will take chances on her.' "

The record is clear that plaintiff bought a horse that, if well, would have been worth $150 or more. When he bought he knew it was sick. The defendants told him it had a cold. He did not pursue the inquiry further. There is nothing to indicate that defendants withheld anything from him about which they were asked, nor is there anything to challenge their good faith in the transaction. Under the facts disclosed by this record the court did not err in his charge or in his refusal to give the requests to charge.

Judgment is affirmed.

STEERE, C. J., and McALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.